STATE of Missouri, Respondent,

v.

Judy Irene ROGERS, Appellant.

No. KCD 29113.

Missouri Court of Appeals, Kansas City District.

Oct. 2, 1978.

Motion for Rehearing and/or Transfer Denied Nov. 13, 1978.

Joe Hamilton Scott, Public Defender, 5th Judicial Circuit, St. Joseph, for appellant.

John D. Ashcroft, Atty. Gen., Nannette K. Laughrey, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., SWOFFORD, C. J., and WASSERSTROM, J.

SHANGLER, Presiding Judge.

The defendant Judy Rogers was convicted of the second degree murder of one Sandra Beam and was sentenced to a term of life imprisonment. The murder was shown as an act of revenge. The victim had encouraged the defendant to attend a party where she was set upon and raped by the male company. The sufficiency of the evidence to convict is not in question, therefore we forgo the sordid narrative.

The circumstances of the crime are best described as a debauchment which commenced when victim Sandra Beam allowed her pubic hairs to be shorn and thereafter was subjected to forced ingestions of vodka, gin, nail polish and other harmful substances. In the course of this bacchanalia, which extended over two days, the victim alternately passed out, was revived by relays of those present, disgorged, was forced to ingest again, and was battered and abused until she died. These events were at the residence of one Gloria Sowards who kept the defendant Irene Rogers and another, Karen Sharp, as house guests. The women and victim Sandra Beam were acquainted as enrollees at the Excelsior Springs Job Corps Center. They were joined at the residence in the early morning

of June 8, 1976, by three men, McDaniel, Russell and Henderson. Later that day, that company was joined by one Stanley Swope. Each of them, at one time or another, joined to restrain and abuse the hapless Sandra Beam. The defendant Irene Rogers commenced that course when she denuded the victim of pubic hair in the presence of the men and on their wager. The defendant also forced her to drink more, struck her repeatedly, first with a belt and whiffle ball bat and then beat her head upon the floor. The evidence was sufficient to support the conviction.

The police came to the Sowards residence in response to a telephone call to the dispatcher at about five p. m. that the dead body of one Sandra Beam was at that address. At about five-thirty p. m. Officers Taff and McGaughy knocked at the front door of the premises and saw two men take flight from the rear. They gave chase and caught McDaniels, but the other escaped. By this time, two other officers, Funk and Lopez arrived on the premises and were let in by a small child [the infant daughter of Gloria Sowards]. These officers found a young woman laid out on a recliner chair in the front room, covered with a blanket. It was the body of Sandra Beam already dead. They summoned an ambulance and then went to the front yard of the house where they began to question the small crowd of people gathered there. In the course of this investigation, Judy Rogers and Karen Sharp were arrested as they stood on the sidewalk outside the house in the crowd. An hour or more later Gloria Sowards arrived and was met by police officers outside the house. She entered her home, identified the body of Sandra Beam as her babysitter and was arrested also. In the interim, three additional police officers, who had arrived at about five-thirty that evening, began to search the premises. No warrant had been issued for that purpose. Search

of the front room disclosed a rope behind the heater [used to bind the victim to the chair] and an extension cord. Search of the trash in the kitchen discovered bottles of gin and vodka and a bottle of fingernail polish, among other miscellany; and from the cabinets of the kitchen were seized a bottle of alcohol and a bottle of liquid silver polish.

The defendant Rogers brought formal motion under § 542.296 to suppress from evidence these and other items seized by the police on the Sowards premises on the ground that they were taken without authority of warrant. The motion was submitted on a stipulation by the parties of facts which include those we have recited. The trial court overruled the motion and admitted the evidence. The State justifies the police entry and search of the premises on the exigent circumstances [1] exception to the warrant requirement which accords validity to a warrantless search of the scene of a homicide or of a serious personal injury with likelihood of death where there is reason to suspect foul play. *Davis v. State,* 236 Md. 389, 204 A.2d 76 (1964); *Patrick v. State,* 227 A.2d 486 (Del.1967); *People v. Sutton,* 65 Cal.App.3d 341, 134 Cal.Rptr. 921 (1977). The entry and investigation of emergency, however, must be without accompanying intent to search or arrest. *United States v. Barone,* 330 F.2d 543, 545[4] (2d Cir. 1964). Thus, the doctrine treats the search which follows as merely an extension of the investigative entry [*State v. Oakes,* 129 Vt. 241, 276 A.2d 18, 24[5–6] (1971)] and strictly circumscribed by the nature of the emergency to which it responds. *Mincey v. Arizona,* —— U.S. ——, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978).

Missouri has given effect to the doctrine to receive evidence of crime taken, without warrant, from premises to which the police were called by a victim in the throes of

---

1. The doctrine also goes by the designations, among others, of "emergency exception" [*Stevens v. State,* 443 P.2d 600 (Alaska 1968)], "murder scene exception" [*State v. Duke,* 110 Ariz. 320, 518 P.2d 570 (banc 1974)] and "exceptional circumstances exception" [*Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1947).

death from gun wounds.[2,3] The State contends that in the circumstances the evidence taken from the Sowards residence without authority of warrant was from a lawful entry in prompt response to the report of a dead body and during the course of a continuous investigation which never relinquished official control of the premises. Thus, the State discards the contention that the search without warrant was unreasonable even though there was ample time to resort to the judicial process for such authority—on the rationale that an entry onto private property in response to an emergency imports reasonableness ipso facto so long as the official action is prompt and the investigation which yields the evidence continuous.

The United States Supreme Court has recently reaffirmed that searches outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment, and in the course of decision, rejected the doctrine that the mere fact of homicide creates an exigent circumstance that will justify a warrantless search under the Constitution. *Mincey v. Arizona,* —— U.S. ——, 98 S.Ct. 2408, 57 L.Ed.2d 290 (adopted June 21, 1978). The Court did not question the duty of the police to respond to an emergency, nor the right of an officer at a homicide scene to make a prompt warrantless search of the area for other victims or the presence of the killer, nor the right to seize evidence in plain view during legitimate emergency investigation, but concluded that the mere claim of exigency—without showing that evidence would be destroyed or lost during the time required to obtain a search warrant—does not justify the sacrifice of privacy entailed by an unlimited search of premises. The Court thus declared that a true emergency will justify police entry upon private premises to give immediate aid, and in cases of homicide, to find victims and seek out killers, but will not justify a search unless there be apt cause for concern that evidence would be lost, destroyed or removed before a search warrant could be obtained.

■ The facts, both as stipulated and as supplemented by witnesses, show circumstances which, by the *Mincey* rationale, do not justify the search into the trash bin, the kitchen cabinets and behind the heater in the front room, as incidents to an investigation of a homicide emergency. Nor did the emergency entry justify the seizure of any evidence other than that found in plain view. At the time the search by officers began, the premises were known to be clear of occupants and were secure. There was

2. *State v. Sutton,* 454 S.W.2d 481 (Mo.banc 1970). It is not altogether clear from the *Sutton* majority opinion whether the victim, who had called for an ambulance and was concerned about the delay, actually requested the police. They appeared, in any event, and searched the premises although by that time the victim had been removed (See dissent of Finch, J., pp. 489 et seq.). The majority held that the search in response to an emergency justified the entry and no further consent was required for the search which yielded incriminating evidence to convict the wife of the homicide of the victim who eventually died of the wounds. The continued efficacy of the doctrine in Missouri was recognized in *State v. Wiley,* 522 S.W.2d 281, 293[27] (Mo.banc 1975) and *State v. Miller,* 486 S.W.2d 435, 436 (Mo. 1972). It should be noted that on the habeas corpus proceeding in the federal court to determine anew the validity of the search and seizure of the Sutton premises, the Eighth Circuit of the United States Court of Appeals concluded that the emergency doctrine was misapplied under the facts in *Sutton. Root v. Gauper,* 438 F.2d 361 (8th Cir. 1971).

3. Our opinion does not mean to hold that mere report to the police of a dead body, without basis for reasonable belief that the death was unnaturally caused, will justify police entry onto private premises under the emergency doctrine. See, *State v. Epperson,* 571 S.W.2d 260, l. c. 264 (Mo.banc 1978); *Patrick v. State, supra,* l. c. 489[3–9]; *Root v. Gauper, supra,* l. c. 364[8]. The evidence by stipulation, as supplemented by the testimony of dispatcher Officer Elliott, shows only a report by Karen Sharp to the police of the dead body of Sandra Beam at the Sowards address. That report made no intimation of an illicit cause of death. We do not confront the question whether the police entry was on reasonable belief of a homicide and thus within the operation of the emergency doctrine because the defendant [p. 33 appellant's brief] concedes the initial entry was lawful "in order to give aid and emergency assistance to Sandra Beam."

no threat to the contents of the residence and no cause for search without a warrant. The first officers at the scene, Taff and McGaughy, arrived at five-thirty p. m., and as they approached saw two men flee from the rear, gave chase and captured McDaniel. They returned, but by that time, Officers Funk and Lopez had arrived, were let in by a frightened Sowards child, discovered the dead Sandra Beam, summoned an ambulance and placed the two Sowards infants with a next-door neighbor. The premises were then empty. Another relay of officers arrived at about five-fifty p. m., and ten minutes later, Detective Pasley took charge of the investigation and all three commenced a thorough search of the interior premises. The search continued until about nine-thirty p. m. and was joined by other officers and the prosecuting attorney. Thus, a concerted search activity extended over three and one-half hours *after* the premises were secured by Officers Funk and Lopez for evidence in hidden places, and no reason appears why a formal warrant was not obtained by judicial process before the privacy of the household was disrupted. [Cf. *State v. Dayton*, 535 S.W.2d 469, 486[6–8] (Mo.App.1976)]. It was a simple matter to protect against theft or destruction of the evidence by a posted guard during the procedure for a warrant. The body had been found and the house searched for sources of potential danger or other victims. The search went beyond the exigency to investigate the report of a dead body which justified the initial entry, and so was illegal. *Mincey v. Arizona, supra,* l. c. 2413[4]; *Terry v. Ohio,* 392 U.S. 1, 25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

▮ Nor was the search incident to lawful arrest. The purpose of such a search is to protect the officer who arrests from harm and to prevent the destruction of evidence—and so may not validly go beyond that proximity within which the arrested person might reach for a weapon or gain access to the evidence. *Chimel v. California,* 395 U.S. 752, 768, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *State v. Peterson,* 525 S.W.2d 599, 604[5] (Mo.App.1975). The arrests of all those accused of the murder except for Gloria Sowards—were made *outside* the residence. McDaniel, upon capture from flight, and Karen Sharp and Irene Rogers on the sidewalk within the vicinity of the house. The State cannot—and does not—contend that the residence was within the ambit of search incident to a sidewalk arrest. *Commonwealth v. Robinson,* 218 Pa.Super. 49, 269 A.2d 332 (1970). Nor is there evidence that any arrestee made a dash for the house interior for a weapon or to destroy incriminating evidence. Nor is there claim that the search of the interior of the Sowards residence was incident to her arrest within the premises. The stipulated evidence shows that her presence within the house was momentary, only to identify the body of Sandra Beam, and then to be taken in arrest there and promptly removed. No exigency attended that action to justify systematic search of her home and, in fact, by that time, the search had already progressed for more than an hour. The stricture of *Chimel,* supra, that the area of legitimate search incident to arrest is described by the reach by the arrestee for a weapon or evidence, applies with equal validity where the arrest is made on private property. 1 Varron, Searches, Seizures and Immunities, p. 200 (2d ed. 1974). The arrest of Gloria Sowards presented no exigency to allow exception to the requirement for a search warrant.

Most recently, the Missouri Supreme Court in *State v. Epperson,* 571 S.W.2d 260 (Mo.banc adopted September 12, 1978), reaffirmed the continued effect of the emergency doctrine to allow police warrantless entry upon premises to investigate a dead body. The police were prompted to this action by reports from members of the family that the married daughter and children had been missing several days, by the stench of decomposed flesh detected in the house and by other circumstances which led to a reasonable conclusion that the daughter and children may have been victim to criminal injury or death. The police made entry on that exigency, discerned a covered human form on the bed and discovered the dead bodies of the daughter and children,

one of them with a cord tied around the neck, others with heads covered with plastic bags, and another with a sock near the face. [Later autopsy detected chloroform in the vital organs of the victims and also determined that they had been struck with a blunt instrument.] These instrumentalities of the crime were seized by the police. After the bodies were removed, a further cursory investigation of the rest of the house discovered a five gallon can of gasoline in the nearby hallroom, a chisel and bottle of chloroform on the cabinet in the kitchen. This evidence was also seized. The question arose as to the legality of a search into the house areas, other than the bedroom where the bodies were discovered, when the police had already determined there were no other victims and the killer was not to be found. The court answered that in the circumstances the exigency continued and so the "limited superficial search" which discovered the chloroform and chisel in plain view, were within the temporal and spatial compass of the emergency entry and search rule. The decision rested this point on the authority of *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) where the exigency was a fire and the warrantless entry was by firemen into a furniture store and the evidence seized were items in plain view which suggested the blaze was set deliberately. The United States Supreme Court in *Tyler* validated the evidence as taken in the course of the exigency: entry without warrant to extinguish the fire, determine the cause and prevent its recurrence. *Epperson* —where the evidence taken also was in plain view— distinguished its facts from the four-day search in *Mincey* into closed drawers, closets and cabinets by officers who entered the premises following the wounding of a narcotics agent—and so found Mincey irrelevant as a precedent.

■ One constant rationale underlies each of these cases: when the emergency which validates the original warrantless entry ceases, further investigation may not proceed without authority of warrant. That is, the emergency warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, l.c. 2413[4]; *Terry v. Ohio*, 392 U.S. 1, 25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Tyler* and *Epperson* the exigency continued when the evidence in plain view was taken. In *Mincey* the emergency had run its course and, in any event, did not justify the systematic search into hidden places. The circumstances before us are more consonant with those before *Mincey* and we are controlled by that decision. As in *Mincey*, and unlike *Tyler* and *Epperson*, the emergency which prompted and justified the initial entry had run its course when the evidence was discovered—the premises were clear of persons, victims or killers so that there was no longer danger to the police or threat of loss of evidence. As in *Mincey*, and unlike *Tyler* and *Epperson*, the evidence taken was not found in plain view incident to an emergency investigation, but in hidden places incident to deliberate and systematic search after the excuse of exigency had passed.

■ That is merely to say again that, as a matter of constitutional principle, the emergency doctrine is not just another means to justify a warrantless search but for entry onto private premises to respond to urgent need for aid or protection, promptly launched and promptly terminated when the exigency which legitimates the police presence ceases. [*McDonald v. United States*, 335 U.S. 451, 454–6, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *People v. Roberts*, 47 Cal.2d 364, 303 P.2d 721, 722 (1956); Fischer, Search and Seizure, pp. 233–235 (1970)]. The entry must be without accompanying intent to search or arrest [*United States v. Barone, supra*] and the investigation must be only as broad as the exigency to which it responds. [*Mincey, supra*, l.c. 2414]. Where the exigency is a homicide, the entry is justified to find the victims and perpetrators by a scan of the premises, and in the absence of other unusual circumstances, ends there. [*Mincey, supra*, l.c. 2414]. Those items in plain view to the police in the course of their legitimate emergency activity may be taken as evidence. That which is in open view when taken is not the product of a search. *Patrick v. State, su-*

pra, l.c. 489[10, 11]. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1974). And that evidence may be used to convict a person against whom the charge is brought. The competency of such evidence rests on the principle that what a person voluntarily exposes to the public view, even in his own home, does not come under the protection of privacy of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Mascolo, Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buffalo Law Review 419, 425 et seq. (1972–3).

We conclude that the evidence found from the search of the kitchen cabinets and trash bin and concealed behind the front room heater was not lawful evidence under the emergency doctrine as expounded by the Supreme Court of Missouri or United States Supreme Court precedents. The trial court erred in the denial of the motion of defendant Rogers to suppress those items from proof of the offense charged.

The Fourth Amendment, however, protects persons not places. *Katz v. United States, supra.* The earlier premise that property interests, alone, determine status to question the legality of police intrusion and search has given way to recognition that the Fourth Amendment protects the reasonable expectation of privacy of a person. *Jones v. United States*, 362 U.S. 257, 265, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *In re J.R.M.*, 487 S.W.2d 502, 505[2] (Mo.banc 1972). The question whether defendant Rogers was victim of an illegal search, and thus had status to complain of the police search of the Sowards premises which yielded evidence used to convict her, therefore, depends upon her relationship to those premises. *State v. Dodson*, 556 S.W.2d 938, 949[20, 21] (Mo.App.1977).

The United States Supreme Court in *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) accorded *per se* status to contest the validity of a search or seizure to a defendant who [l.c. 228] (1) was legitimately on the premises at the time of the police conduct (2) or who had a proprietary or possessory interest in the premises (3) or who was charged with an offense, an essential element of which was possession of the goods seized. The defendant Rogers was not present when the police entered the Sowards premises, or thereafter during the prolonged search, nor was she charged with a crime which involved the possession of the items taken in the search. Her status to claim exclusion of the evidence rests, if at all, on her expectation of privacy from her possessory interest as a continued occupant of the Sowards premises.

The agreement of facts between the defendant and the State on the motion to suppress the evidence taken in the search stipulates that the defendant Rogers arrived at the Sowards house on January 6, 1976, with two suitcases of personal belongings and remained there as the guest of Gloria Sowards until the arrest of the defendant on January 9, 1976. This evidence imports that although defendant Rogers was not present at the time of the police entry she continued as an occupant of the Sowards premises and her expectations to that privacy were not abandoned by temporary absence. The evidence shows also that during the occupancy defendant Rogers had free run of the house: she slept on a divan in the living room, used the bathroom facilities and the kitchen as well. Her expectation of freedom from governmental intrusion, therefore, extended into the areas of actual search to which she continued to have regular access and use. The right to use premises is alone sufficient to vest status to contest the legality of a search. *Spinelli v. United States*, 382 F.2d 871, 879[4, 5] (8th Cir. 1967); *In re J.R.M., supra*, l.c. 509.

The evidence before the trial court required judgment for the defendant Rogers on her motion to suppress State Exhibits 10, 11, 12, 14, 15, 16 and 17 taken in the illegal search of the Sowards premises and used to convict the defendant. The express provisions of § 542.296.6 place "the burden of

going forward with the evidence and the risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled." This statute, enacted by the Laws of 1974 [p. 922, § 8], discards the earlier practice which cast both the procedural and substantive burdens upon the defendant to prove the motion by a preponderance of the evidence. *State v. Holt*, 415 S.W.2d 761, 764[1, 2] (Mo.1967). The stipulated facts that after Officers Funk and Lopez entered the Sowards premises and removed the two infants to a house next door and that, then, only the dead Sandra Beam and the officers remained in the building [that is, that the premises were secure] sufficiently prove the contention of the motion that search thereafter without warrant was unlawful. There was no evidence in contradiction of this intendment of the stipulated fact and so the State failed to show by a preponderance of the evidence that the motion to suppress should be overruled. [The proof at the trial merely corroborated the inference of the stipulation that the Sowards premises were neither a source of danger to the investigators nor vulnerable to the loss of evidence by the time the warrantless search for evidence began.]

■ There remains the question of consent. The permission to search premises or effects may be given validly by any person with common authority over or sufficient relationship to the property. The common authority which endows a power to consent "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 172 n. 7, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *United States v. Green*, 523 F.2d 968, 971[1] (9th Cir. 1975). A consent to the search by Gloria Sowards, by these principles, would have bound the defendant Rogers who assumed the risk of any such permission by her host, but by the stipulated facts, neither Sowards nor Rogers gave the police consent to entry, nor were they asked, nor were they present.

Another contention by the defendant requires response for guidance to the parties and court upon the eventual retrial. Police Officers McGaughy and Funk were allowed to testify, over objection, that when Karen Sharp confronted the defendant Rogers in the company of the mingled crowd near the Sowards premises they heard Karen Sharp say to defendant Rogers: "Judy, you are the one that dumped alcohol down her"—to which the defendant made no response. The defendant Rogers complains that the admission of the statement infringed her right against self-incrimination and prejudiced the verdict. The State contends the statement was admissible as a tacit admission.

■ The operation of the tacit admission rule as employed in Missouri presupposes three conditions: (1) that the statement was made in the presence and hearing of the accused (2) that the statement was sufficiently direct as would call for a reply (3) that the statement was not made at a judicial proceeding or while the accused was in custody or in arrest. *State v. Samuel*, 521 S.W.2d 374, 375[1] (Mo.banc 1975). There is no dispute but that the first two requirements were met. The defendant contends, rather, that when the statement was uttered to her she was then "in constructive, if not actual custody and under arrest."

■ The evidence shows that a small crowd had gathered outside the Sowards house shortly after the relays of police appeared. Karen Sharp and Judy Rogers mingled among them. Officers McGaughy and Funk made inquiries of those present. McDaniel [who had fled the premises and was captured by Officers McGaughy and Taff] pointed out the defendant Judy Rogers to McGaughy. McGaughy then went over to Officer Funk "to tell him something that McDaniel had told [him]." Officer Funk was then talking to Karen Sharp in

the midst of a crowd. Although there is intimation that McGaughy intended to tell Funk that McDaniel had told him Judy Rogers "was also involved," that response was disallowed as hearsay on the objection of defense counsel. McGaughy beckoned to Judy Rogers to "come up here" [into the presence of Officer Funk and Karen Sharp] and as Judy Rogers in the company of McGaughy came within a couple of feet of Funk and Sharp, Karen Sharp stated to the defendant: "Judy, you are the one that dumped alcohol down her." At this, Officer Funk promptly advised *Sharp* not to say anything else and read her the *Miranda* warnings. The defendant Rogers made no response to accusation by Karen Sharp. Judy Rogers was placed in arrest shortly thereafter.

The record shows no competent evidence to indicate that the suspicion of the police had focused on any role Judy Rogers had in the death of Sandra Beam at the time of the statement by Karen Sharp. There had been no formal arrest nor do the circumstances allow inference of any restraint, actual or tacit, on the movements of Judy Rogers. There are vague intimations that the McDaniel conversation with Officer McGaughy in the police car may have aroused police suspicion of involvement by Rogers, but that is a speculation not supported by the police conduct. Karen Sharp, *not* Rogers, was advised not to say anything more. Then each woman was separately administered the *Miranda* warnings. At the time of the statement Sharp, and not Rogers, was the focus of suspicion. Only *after* the statement by Sharp did Rogers also become a subject of suspicion. Nor does the evidence support the alternative contention of the defendant that her arrest followed the statement by Sharp so shortly as to prevent or discourage her response. The evidence of the statement was admissible under the rule of *State v. Samuel, supra.*

The two contentions of error which remain: that the trial court abused its discretion by failure to discharge the jury panel because of certain responses during the voir dire and by failure to grant a continuance—

need not be answered. The order for retrial renders these questions moot.

 There was no contention at the trial, nor does our review disclose, that the evidence without the exhibits we have ruled inadmissible was not sufficient for conviction. These exhibits corroborate the testimony, and thus the credibility of eye-witnesses McDaniel, Swope and Russell, as to these instrumentalities of death and thus the verity of the fact of the crime. We cannot say confidently beyond a reasonable doubt, therefore, that the illegal evidence did not bear on the verdict of the jury. Accordingly, the judgment of conviction is reversed and remanded for a new trial.

SWOFFORD, C. J., concurs.

WASSERSTROM, J., concurs in separate opinion filed.

WASSERSTROM, Judge, concurring.

I concur in the conclusion of the principal opinion but differ slightly in theory. The sole purpose of this concurrence is to expound that difference.

The principal opinion stresses that the emergency exception does not justify the seizure of any evidence other than that found in plain view. It in effect limits the emergency doctrine to giving an excuse for entry, without affording any justification for a search. According to the reasoning of the principal opinion, a search and seizure of evidence can be justified, if at all, only under the separate plain view doctrine.

My reading of *Epperson* and *Mincey* leads to a broader interpretation of the emergency exception and convinces me that this doctrine does in fact authorize a limited type of search and affords a basis for seizure of evidence independent of the plain view doctrine. This would seem the plain meaning of *Epperson*, which pointedly distinguishes the two doctrines at p. 268: ". . . the bodies, plastic bags and chloroformed socks and venetian blind cord were discovered in the bedroom and admissible under the plain view doctrine and *the evidence from the other part of the house (i.*

e., the gasoline can, chisel, bottle of chloroform and certain of the photographs) were within the scope of the emergency exception." The importance of the distinction so drawn can be fully appreciated only by remembering that Epperson had already held (at p. 266): "The admission of evidence from rooms of the house other than the bedroom . . . cannot be justified under the plain view doctrine . . ."

Nevertheless, the emergency exception did not extend to permit seizure of the evidence challenged here. Epperson acknowledges that a search under the emergency exception must be one of "limited intensity" and ruled that the search there involved was so limited and was therefore distinguishable from the one held unjustified in Mincey v. Arizona. As pointed out in the principal opinion, the search here was an intensive one, including the deliberate and systematic search into hidden places. Because of this feature, the present case is like Mincey and unlike Epperson. So, the search in this case was unconstitutional, and the evidence seized should have been suppressed.