STATE of Missouri, Respondent,

v.

Larry TAYLOR, Appellant.

Larry TAYLOR, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 17583, 18191.

Missouri Court of Appeals,
Southern District,
Division One.

June 17, 1993.

Motion for Rehearing or Transfer to
Supreme Court Denied July 9, 1993.

Application to Transfer Denied
Aug. 17, 1993.

Raymond L. Legg, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

This case, in the ninth year of an odyssey through the Missouri judiciary, reaches this Court a second time.[1]

A jury found Appellant, Larry Taylor, guilty of two counts, each a violation of § 195.020.1, RSMo Cum.Supp.1983 [2]:

Count I: Manufacturing marihuana;

Count II: Possession of more than 35 grams of marihuana.

The trial court sentenced Appellant, as a persistent offender, to imprisonment for twelve years on Count I and six years on Count II, consecutively. Appellant brings appeal 17583 from that judgment.

While appeal 17583 was pending, Appellant commenced a proceeding per Rule 29.-15 [3] to vacate the judgment. The motion court denied relief without an evidentiary hearing. Appellant brings appeal 18191 from that order.

We consolidated the appeals, Rule 29.-15(*l*) but address them separately in this opinion.

Appeal 17583

Appellant presents two points relied on, each of which concerns Count I only. The first point asserts the marihuana on which Count I was based should have been suppressed as evidence because it was obtained in an unlawful search and seizure. The second point maintains there was a fatal variance between the crime charged in Count I and the verdict-directing instruction by which that count was submitted to the jury. Because the sufficiency of the evidence to support the guilty verdicts is unchallenged, we set forth only the evidence pertinent to the claims of error.

█ Evidence germane to the first point was presented May 15, 1986, at a hearing on Appellant's motion to suppress.[4] In narrating the evidence, we honor the rule that the evidence and reasonable inferences arising from it are to be stated favorably to the trial court's ruling. *State v. Blair*, 691 S.W.2d 259, 260[1] (Mo. banc

1. The case began in McDonald County with the filing of two felony complaints on October 6, 1984. It went to Phelps County on change of venue, where a 1986 jury trial resulted in two guilty verdicts and consecutive sentences of twelve and six years. This Court reversed the judgment because evidence was erroneously admitted. *State v. Taylor*, 739 S.W.2d 220 (Mo. App.S.D.1987). After remand, the case was tried anew in 1989. A jury again returned guilty verdicts, but the trial court granted a new trial. In 1990, the case was sent from Phelps County to Howell County on change of venue, where a jury trial was held March 25–26, 1991. The consolidated appeals addressed in this opin-

ion arise from that trial and the postconviction proceeding that followed it.

2. Section 195.020, RSMo Cum.Supp.1983, was carried forward unchanged in RSMo 1986. It was repealed effective August 28, 1989, by C.C.S.H.C.S.S.C.S.S.B. 215 and 58, Laws of Missouri 1989, pp. 597–641. All references to statutes in this opinion are to RSMo Cum.Supp. 1983.

3. Rule references are to Missouri Rules of Criminal Procedure (1992).

4. The hearing was conducted by Circuit Judge Weldon W. Moore (since retired).

1985), *cert. granted*, 474 U.S. 1049, 106 S.Ct. 784, 88 L.Ed.2d 762 (1986), and *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987).[5] We disregard contrary evidence and inferences, and affirm the trial court's ruling if the evidence is sufficient to sustain that court's finding. *Id.*, 691 S.W.2d at 260[2].

So viewed, the evidence establishes that a few weeks before October 5, 1984, Tom West, a McDonald County deputy sheriff, went to a mobile home in that county to serve "civil papers." There, West encountered Appellant, who stated "it was his place." West's testimony:

Q And did [Appellant] say who lived there with him?

A At that time, no.

Q He just said he lived there?

A Yes.

About 4:30 p.m., October 5, 1984, West returned to the mobile home with two warrants for Appellant's arrest: a misdemeanor warrant for an assault on Darlene Kinslow (who resided with Appellant in the mobile home), and a felony warrant for an assault on one Evenson.[6]

Appellant came out of the mobile home as West approached. West arrested Appellant and escorted him to West's automobile.

About that time, McDonald County deputy sheriff Lloyd Perkins arrived by automobile. He parked about ten feet from a structure described in the record as a "metal covered shed" and an "outbuilding." We henceforth refer to it as "the shed." According to Perkins, the shed was between forty and sixty feet from the mobile home.

As Perkins exited his automobile, he thought he "smelled something burning." The aroma was emanating from the shed. He also heard "a motor or something running."

Perkins went to the shed door; it was locked. He then went to a window and raised it. A blanket covered the opening.

Perkins pushed the blanket aside and looked in. He testified:

[I]t was kind of hazy in there, and I seen this motor, looked like a heater, or something, blowing down there. And I also seen what appeared to be marijuana on some screens. Looked like screens off of the window....

Perkins reported the discovery to McDonald County sheriff Lou Keeling, who had arrived with deputy sheriff John Heiskell. Shortly thereafter, everyone departed except Perkins.

Deputy West took Appellant to the sheriff's office in Pineville, booked him, and "locked him up." Sheriff Keeling then directed West to return to the mobile home and "stand by" while Darlene Kinslow removed her belongings.

West arrived back at the mobile home around 5:30 p.m. Perkins was still there. Ms. Kinslow arrived a few minutes later.

She entered the mobile home, accompanied by West and Perkins, and began gathering her possessions. As she did so, West and Perkins observed marihuana in several places in the mobile home. The marihuana was seized, and was the basis for Count II. Its admissibility is not questioned in this appeal.

About a half hour passed while Ms. Kinslow removed items from the mobile home. During this time, deputy Heiskell reappeared, accompanied by a highway patrolman.

Asked how long he stayed in the mobile home while Ms. Kinslow was picking up her belongings, Perkins testified, "I wasn't in there too long at that time." Then, this:

Q Where did you go?

A Back outside to try to keep watch on the [shed].

....

Q Had it caught fire, yet?

A No, but I was checking on it because I thought the motor was getting hot.

---

**5.** An unrelated holding in *Blair* was overruled in *State v. Mease*, 842 S.W.2d 98, 106 (Mo. banc 1992).

**6.** The events from which these warrants arose are reported in *Taylor*, footnote 1, *supra*, 739 S.W.2d at 221–22.

After Ms. Kinslow left the mobile home, Perkins removed some screws from a hasp by which a padlock secured the shed door. This enabled West to open the door.

The officers entered the shed and found marihuana suspended on screens above a heater blowing warm air upward. West disconnected the heater. The officers seized the marihuana, which was the basis for Count I.

■ Appellant's first point avers the trial court erred in denying Appellant's motion to suppress the shed marihuana as evidence in that it was seized in violation of his constitutional right to be free from an unreasonable search and seizure. Appellant asserts no exigent circumstances existed to search the shed without a search warrant, and the marihuana was not in plain view.[7]

The State maintains Perkins lawfully discovered the shed marihuana in that exigent circumstances existed which justified his opening the window, pushing aside the blanket, and peering in. The State underscores this segment of Perkins' testimony:

Q Why did you look into the [shed]?

A Because I was afraid something was on fire in there.

The State relies on *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). There, the Supreme Court of the United States recognized that a burning building creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. 464 U.S. at 293, 104 S.Ct. at 646.

Here, of course, no flames were coming from the shed. However, according to Perkins, he thought he smelled something burning. An odor was a crucial factor in *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), where the Supreme Court of Missouri held an entry into the accused's home, without warrant, followed by seizure of evidence therein, was permissible because of exigent circumstances.

The State says Perkins' fear that something was afire in the shed was a circumstance of sufficient exigency to allow him to do what he did, without warrant, in determining whether a fire existed. Once he saw the marihuana, continues the State, the "plain view doctrine" applied.

■ That doctrine is recognized and set forth in *State v. Schneider*, 736 S.W.2d 392 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). It allows seizure of evidence, without a search warrant, when: (1) the evidence is observed in plain view while the officer is in a place he has a right to be; (2) the discovery of the evidence is inadvertent; and (3) it is apparent to the officer that he has evidence before him. 736 S.W.2d at 399[4]. The doctrine applies where the initial intrusion that brings the officer within plain view of the evidence is authorized by a recognized exception to the warrant requirement, such as the exigent circumstances exception. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

We hold the evidence sufficient to support a finding that exigent circumstances existed—Perkins' fear that something was afire in the shed—justifying his raising the window, moving the blanket, and looking inside. *See United States v. Echegoyen*, 799 F.2d 1271, 1278–79[4] (9th Cir.1986). Consequently, no constitutional right of Appellant was violated when Perkins discovered the shed marihuana.

■ Appellant argues that even if Perkins' discovery of the shed marihuana was lawful because of exigent circumstances, the seizure was unlawful because of the delay between discovery and seizure. As best we can reconstruct the time sequence from the evidence, an hour and a half to two hours elapsed between discovery and seizure.

**7.** As reported in *Taylor*, footnote 1, *supra*, 739 S.W.2d at 221, the officers obtained a written "Consent to Search" from Ms. Kinslow before Appellant was arrested. The State, in its brief, does not contend Perkins discovered the shed marihuana as a result of a search pursuant to the "Consent."

Citing *State v. Rogers*, 573 S.W.2d 710, 716 (Mo.App.1978), Appellant asserts that when the emergency validating the original warrantless entry ceases, further investigation may not proceed without authority of warrant. *Id.*

Other jurisdictions have considered instances where a delay occurred between discovery of evidence in plain view and physical seizure of it. In *State v. Jolley*, 312 N.C. 296, 321 S.E.2d 883 (1984), *cert. denied*, 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 816 (1985), the accused fatally shot her husband in their home, then immediately phoned for help. A rescue squad and a law enforcement officer responded. The officer entered and saw a rifle six feet from the victim, who was being attended by rescue technicians. The officer escorted the accused to his patrol car, then secured the residence. Other officers arrived, and one entered the residence. He saw the rifle and also found some spent cartridges and shells. After six hours in the residence, the officer took possession of those items.

The Supreme Court of North Carolina held the rifle admissible in evidence. The opinion said:

We hold that when a law enforcement officer enters private premises in response to a call for help and thereby comes upon what reasonably appears to be the scene of a crime, and secures the crime scene from persons other than law enforcement officers by appropriate means, all property within the crime scene in plain view which the officer has probable cause to associate with criminal activity is thereby lawfully seized within the meaning of the fourth amendment. Officers arriving at the crime scene thereafter and while it is still secured can examine and remove property in plain view without a search warrant.

321 S.E.2d at 886[1].

A similar result was reached in *Smith v. State*, 419 So.2d 563 (Miss. banc 1982), *cert. denied*, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983). There, officers entered the accused's apartment under exigent circumstances (a belief that a female robbery victim might be there, alive and in need of immediate assistance). 419 So.2d at 571. The officers observed articles of women's clothing and other items, but failed to find the victim. They departed after some four minutes, and a short time later found the victim, dead, in a ditch some fifty yards distant. Crime lab technicians then entered the accused's apartment and gathered various items which incriminated him. The Supreme Court of Mississippi held the items admissible, pointing out that when such items were first discovered, the immediate objective was finding the victim, not collecting evidence. The opinion continued:

The actions of ... members of the mobile crime lab (after the re-entry of the apartment) were merely to effectuate the physical seizure of articles in plain view which [the officers who originally searched the apartment] would have been able to seize had not the circumstances been so "exigent". There was no unwarranted delay in time, nor was there any expansion of the scope of the search. The fact that the actual physical taking of the items into the custody of the police was effectuated by an evidence technician who was trained to preserve the evidentiary value of the objects, rather than by the first officers to view the objects, is not significant.

419 So.2d at 572.

In the instant case, it is evident that when Appellant was arrested, the officers intended to secure the mobile home until Ms. Kinslow could remove her possessions. When Perkins discovered the shed marihuana (the mobile home marihuana had not yet been found), it is obvious the officers intended to guard the shed until they had time to gain entry and collect the marihuana there.

Shortage of personnel made it necessary for Perkins to remain at the scene, alone, while West took Appellant to jail. Once West returned and Ms. Kinslow arrived, she was allowed to take her belongings from the mobile home. During much of the time she was doing so, Perkins continued watching the shed, fearing the heater's motor was getting hot. When the mobile

home marihuana was discovered, the arrival of other officers facilitated its seizure, and afterward the entry into the shed and removal of the marihuana there.

We find the analysis of *Jolley*, 321 S.E.2d 883, and *Smith*, 419 So.2d 563, logical and persuasive. Applying their reasoning here, we hold that for the purpose of the Fourth and Fourteenth Amendments to the Constitution of the United States, and Article I, § 15 of the Constitution of Missouri (1945), the shed marihuana was seized when Perkins discovered it while looking in the window. From that time on, the shed was under the control of Perkins, and later other officers, while more urgent tasks were performed. When those duties were completed, the officers gained entry to the shed and gathered up the marihuana there. We deny Appellant's contention that the seizure of the shed marihuana violated his constitutional protection against unreasonable searches and seizures.

There is a second reason the shed marihuana was lawfully seized. As noted earlier, Perkins continued to "keep watch" on the shed while Ms. Kinslow removed her belongings from the mobile home. He testified he did so because he thought the motor was getting hot. As we understand West's testimony, the first thing he did after entering the shed was unplug the heater.

That evidence is sufficient to support a finding that exigent circumstances still existed when the officers entered the shed, i.e., danger the motor would overheat and ignite a fire. It is obvious the officers did not intend to depart until that hazard had been eliminated.[8] When they entered the shed, the marihuana was in plain view, hence its seizure was permissible under the plain view doctrine discussed earlier.

Appellant's first point is denied.

■ His second point complains the State alleged in a bill of particulars that it would prove he manufactured marihuana by harvesting, but the hypothesis submitted to the jury was manufacturing by processing. The point is based on the following facts.

Count I of the amended information on which Appellant was tried pled he "knowingly manufactured" marihuana. It supplied no details.

Appellant moved for a bill of particulars. The trial court granted the motion.

The State filed a bill of particulars stating it intended to prove Appellant manufactured marihuana by harvesting it, acting alone or with others. The bill further stated the harvested marihuana was located in a shed approximately sixty feet from Appellant's residence, and included 530.5 grams found on a wire screen in the south end of the shed and 531.41 grams found on a wire screen in the north end.

The verdict-directing instruction by which Count I was submitted to the jury hypothesized Appellant manufactured marihuana *by drying and processing harvested marihuana.*

Appellant correctly points out there was no evidence he harvested the shed marihuana. Consequently, argues Appellant, the evidence failed to prove he committed the crime set forth in the bill of particulars. In Appellant's words, "The State charged [me] with one offense and convicted [me] of another." Citing *State v. Moseley*, 735 S.W.2d 46, 48 n. 1 (Mo.App.W.D.1987), Appellant asserts that when the State files a bill of particulars, it is restricted in its proof to the averments in the bill.

*State v. Lee*, 841 S.W.2d 648 (Mo. banc 1992), is dispositive of Appellant's second

---

**8.** Appellant faults the officers for not disconnecting the heater when Perkins first discovered the shed marihuana. Appellant maintains this demonstrates the claimed exigency was a pretext. While the evidence is not as precise as it might be, it appears the heater was plugged into an extension cord which ran from the shed back to the mobile home. At the latter end, the cord was plugged into a "hot water receptacle" behind a "doorway" on the outside of the mobile home. It is inferable from West's testimony that some screws had to be removed to gain access to the receptacle. That was apparently done at the end of the operation when West, starting at the shed, rolled up the cord and unplugged it from the receptacle at the mobile home.

point. There, the accused was charged with robbery in the first degree by forcibly stealing property while armed with a deadly weapon. However, the verdict-directing instruction hypothesized the accused committed robbery in the first degree by forcibly stealing property and while doing so caused serious physical injury to the victim. On appeal, the accused maintained the verdict-directing instruction was reversibly erroneous in that it submitted a theory of guilt not charged in the information. The Supreme Court of Missouri observed: "There is no doubt that a variance exists between the information and the instruction. The question is the effect of the variance." *Id.* at 650.

Answering that question, the Supreme Court held:

A variance alone is not conclusive to the question of whether there is reversible error.... [A] variance, to justify reversal, should be material and prejudicial to the rights of the accused.... A variance is prejudicial only if it affects the [accused's] ability adequately to defend against the charges presented in the information and given to the jury in the instructions....

*Id.* at 650.

Here, Appellant demonstrates no prejudice. Although he did not testify, he presented evidence designed to show (a) he did not reside in the mobile home on the date the marihuana was found, and (b) the shed marihuana could have been put there by someone else. Because Appellant's theory of innocence on Count I was that he had nothing to do with the shed marihuana, it made no difference in defense tactics whether the State accused him of harvesting it or drying and processing it. Furthermore, Appellant cannot claim he was surprised by the State's evidence. The bill of particulars specifically described the shed marihuana, setting forth the precise weight and location of the marihuana found on the screens.

As we comprehend Appellant's second point, he concedes "processing" can constitute "manufacture" of marihuana under § 195.020.1, and he does not dispute the premise that "drying" harvested marihuana constitutes "processing." On that subject, § 195.010(21) provides that "manufacture" means, *inter alia,* "processing" of a controlled substance. A chemistry professor, testifying for the State, explained marihuana is ingested by inhaling its vapors in smoking. Green marihuana cannot be smoked, as it will not remain lit. Consequently, drying is necessary for marihuana to be ingested.

Appellant's second point is denied.

Inasmuch as Appellant assigns no error regarding Count II, appeal 17583 is abandoned as to that count. *State v. Berry,* 798 S.W.2d 491, 493–94[1] (Mo.App.1990). The judgment adjudicating Appellant guilty of Counts I and II and imposing the consecutive twelve-year and six-year sentences is affirmed.

### Appeal 18191

■ Appellant presents one point relied on; it alleges he was abandoned by the lawyer appointed to represent him in the 29.15 proceeding, in that the lawyer did not file an amended motion to vacate. *See* Rule 29.15(e). Citing *Luleff v. State,* 807 S.W.2d 495 (Mo. banc 1991), Appellant asserts the order denying postconviction relief must be reversed and the 29.15 action remanded to the motion court for a hearing to determine whether Appellant's lawyer performed the duties required of him by Rule 29.15(e) and whether any failure to perform resulted from Appellant's action or inaction.

The State concedes Appellant is entitled to remand for determination of the above issues.

The procedure for the motion court to follow is spelled out in *Luleff,* 807 S.W.2d at 497–98. The order denying postconviction relief is reversed, and the 29.15 action is remanded to the motion court for further proceedings consistent with *Luleff.*

PARRISH, C.J., and SHRUM, J., concur.