**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Evelyn Mary SHIRE, Defendant–
Appellant.**

**Evelyn Mary SHIRE, Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 16903, 18063.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 25, 1993.

Ellen H. Flottman, Columbia, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

FLANIGAN, Judge.

A jury found defendant guilty of murder in the second degree, § 565.021,[1] and she was sentenced to life imprisonment. Defendant appeals, and that appeal is Case 16903. After the jury trial, defendant filed a motion under Rule 29.15 seeking postconviction relief. The motion was denied after evidentiary hearing. Defendant's appeal from that denial is Case 18063. The appeals have been consolidated and will be dealt with separately in this opinion.

### Case No. 16903

Defendant does not challenge the sufficiency of the evidence to support the verdict. The state's evidence showed that on August 7, 1988, the defendant caused the death of John Shire, her ex-husband, by shooting him.

Defendant and the victim were divorced in July 1988, and the victim was awarded the farm where the shooting occurred. Prior to the divorce, John Shire began dating Judy Perryman, and they were to be married in the fall of 1988. The offense took place shortly before dawn. At that time, Judy Perryman and John Shire were in bed together in the house located on the farm.

Perryman, a witness for the state, testified that she heard the click of a light switch in the hallway and awoke. Perryman saw defendant standing in the hallway. Defendant entered the bedroom and walked to the side of the bed. Perryman said to the victim, "Honey, Eve's here." Perryman saw defendant place a shotgun under the victim's nose and shoot him. The gun was within a few inches of the victim's face when it was fired. Death was instantaneous. Defendant then left the house.

 Defendant's first point is that the trial court erred in overruling her challenge for cause to venireperson Laura Hough, thereby denying defendant her right to a panel of qualified jurors from which to

---

**1.** All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

make her peremptory challenges and denying her a fair trial in that "Hough gave answers on voir dire indicating her inability to sit as a fair and impartial juror since she indicated both that she knew defendant and that she knew Judy Perryman 'pretty well,' believed that [Perryman] was a 'pretty good woman' and that she would 'vouch for' Perryman."

In support of her first point, defendant quotes the following portions of the voir dire examination of venireperson Laura Hough:

> HOUGH: ... Judy [Perryman] ... worked for me for quite sometime.
>
> [DEFENSE COUNSEL]: Do you feel like Judy Perryman's a pretty good woman, from your association with her?
>
> HOUGH: When she worked with me, Judy was a good mother. She had this little boy and raised him. She was a good mother and dependable worker.
>
> . . . . .
>
> [DEFENSE COUNSEL]: Actually you knew Judy Perryman pretty well?
>
> HOUGH: Yes, I do.
>
> [DEFENSE COUNSEL]: And there is no question about it? I mean, you believe she's a pretty good woman?
>
> HOUGH: Yes, I do.
>
> [DEFENSE COUNSEL]: You'd vouch for her?
>
> HOUGH: Yes.
>
> [DEFENSE COUNSEL]: And if she's a state's witness in this case, I mean, you'd tend to feel pretty comfortable when she testifies because you vouched for her?
>
> HOUGH: When Judy worked for me, she was a fine person, and I don't know, you know, the details of all of this, only what I read in the paper.

Although not mentioned by defendant, the voir dire examination of venireperson Laura Hough also included the following:

> [THE PROSECUTOR]: Ms. Hough, we just wanted to talk with you away from the others about what it was that you had heard or read about this case.
>
> Can you tell us what source of information you had about this case?
>
> HOUGH: About the only information that I knew was it came out in the papers and Judy Wilkerson—she worked for me for quite sometime.
>
> [THE PROSECUTOR]: Who is Judy Wilkerson, Judy Perryman?
>
> HOUGH: Yes.
>
> [THE PROSECUTOR]: That was her former name, maiden name?
>
> HOUGH: Uh-huh.
>
> [THE PROSECUTOR]: She worked for you?
>
> HOUGH: Uh-huh, at H.D. Lee.
>
> [THE PROSECUTOR]: Okay. That fact—
>
> HOUGH: And then Kathy Shire, the daughter of Mrs. Evelyn Shire, worked on our floor.
>
> [THE PROSECUTOR]: Okay.
>
> HOUGH: And then I remember when it came out in the paper that she came to this home, and I think it was the home of Mr. Shire, and—
>
> [THE PROSECUTOR]: What else, what other details do you remember?
>
> HOUGH: Judy, I think, maybe tried to call him at the point to awaken him—and really didn't pay a lot of attention to the news.
>
> [THE PROSECUTOR]: Was this everything you've told us of that from the newspaper account?
>
> HOUGH: Yes, and conversations at work. Now, we all knew Evelyn. Evelyn worked for us when I was at Lebcut. She didn't work directly in my line, but she was in quality control there.
>
> [THE PROSECUTOR]: Okay. Let me ask you first of all, Ms. Hough, whether or not any of this other extraneous information would cause you some problems?
>
> In other words, have you formed any opinion based on this stuff that you've heard?
>
> HOUGH: I don't think so, but I, you know.
>
> [THE PROSECUTOR]: Can you promise or try to be a fair juror and just listen to the evidence that we would present to you?
>
> HOUGH: I would try.

[THE PROSECUTOR]: Let me ask you, just briefly, about the personal knowledge you have or association with Judy Perryman, the defendant, or Kathy Shire, Kathy Mizer.

Is your acquaintanceship with any of these people such that it would cause you some difficulty to be fair and impartial to either side in this case?

HOUGH: I don't think so. I talked to Judy at the bank, at Commerce Bank, when I would go in there, and I have not been in the presence of Mrs. Shire for, you know, since we were at Lebcut, and that was in the '70s, I believe.

[THE PROSECUTOR]: Okay. Can you be fair and impartial to the best of your ability?

HOUGH: Yes, I would try.

[THE PROSECUTOR]: Okay. Thanks.

[DEFENSE COUNSEL]: Ma'am, when you say you've talked to Judy Perryman since this event happened—

HOUGH: Well, just going to the bank for business, you know. I have used the Commerce Bank, but I have never discussed the trial with her or anything that happened.

[DEFENSE COUNSEL]: Did you ever say anything like I'm sorry to hear about what happened?

HOUGH: No, no.

[DEFENSE COUNSEL]: And express any sympathy towards Judy Perryman at all?

HOUGH: No.

[DEFENSE COUNSEL]: What about Evelyn Shire? What was your—

HOUGH: I didn't—I was not that close with Evelyn Shire. She only worked in quality control, and as far as knowing a lot about her family or background, you know—

[DEFENSE COUNSEL]: Have you heard anything about her?

HOUGH: Only just shop talk at work.

[DEFENSE COUNSEL]: Just shop talk?

HOUGH: Well, just talking about when this happened and the people that we knew.

[DEFENSE COUNSEL]: Did anyone say anything, well, I always knew she was going to shoot somebody or good riddance, the guy deserved it or—

HOUGH: No, I didn't hear that, sir.

[DEFENSE COUNSEL]: That's what I'm after is what kind of shop talk it was.

HOUGH: Well, just that it happened and she was out there and shot Mr. Shire.

[DEFENSE COUNSEL]: Uh-huh.

HOUGH: But as far as—

[DEFENSE COUNSEL]: Did you know Kathy Shire very well?

HOUGH: No, she didn't work in my line. Worked for the company.

[DEFENSE COUNSEL]: Okay. Actually you knew Judy Perryman pretty well?

HOUGH: Yes, I do.

[DEFENSE COUNSEL]: Ms. Hough, just to be honest with you, I'm probably going to come down pretty hard on her. I'm going to pretty well let her have it. I'm going to call her names. You wouldn't believe what I'm going to—my position in this case.

HOUGH: Uh-huh.

[DEFENSE COUNSEL]: Would that kind of tend to grate you just a little bit? I mean, here's a woman you'd vouch for and here's a defense lawyer up here berating her?

HOUGH: I probably—I don't think so.

[DEFENSE COUNSEL]: You'd take it but you really wouldn't want to?

HOUGH: Well, I believe in values and, you know, I haven't heard all the details of this, and I would have to listen to all that, but I'd try to be real fair.

[DEFENSE COUNSEL]: I appreciate that.

HOUGH: I'd put her, you know, I'd not want—if she has done something wrong, well then, I feel like you need to pay because I believe in strict values and that; but I'm thinking back to the time when Judy worked for me, and she was raising this child, and before she married Perryman, and you know, because—

[DEFENSE COUNSEL]: That must be back in the early '80s?

HOUGH: Well, yes.

[DEFENSE COUNSEL]: Well, if her credibility is an important issue in this case, maybe she says something one way and other witnesses that I put on say something that it was opposite. You'll be asked to choose between Judy Perryman and other peoples' versions.

Would you tend to go with Judy Perryman based on what you know?

HOUGH: I'd make the decision that I thought was right.

[DEFENSE COUNSEL]: Okay. Well, how is that decision—

HOUGH: Well—

[DEFENSE COUNSEL]: —right or wrong? How—is that made in part, at least, on your prior knowledge of her?

HOUGH: No, I would listen to the facts.

[DEFENSE COUNSEL]: Are you saying you could completely disregard your prior relationship with her and your good feelings about her? Could you disregard all that?

HOUGH: I think I could.

[DEFENSE COUNSEL]: Would it be hard to do?

[THE PROSECUTOR]: Your Honor—

THE COURT: I think she's asked and answered it several times.

HOUGH: I believe in honesty and I believe in values. I don't know what questions and I've never been in court like this before, and—but I would try to make my decision by the good book.

. . . . .

[THE PROSECUTOR]: For instance, does anyone know the defendant or John Shire, Evelyn Shire or John Shire? Any one of you familiar with them?

HOUGH: I just remember working with her. She didn't work directly with me but she worked for our company.

[THE PROSECUTOR]: And I think you also said you knew Judy Perryman. You also knew Kathy Shire Mizer. And since we did have a chance to talk with you, Ms. Hough, about that, I don't think there was any problem or anything about

your acquaintanceship or knowledge about those people that would cause you any problems one way or the other; is that right?

HOUGH: That's right.

Some of the interrogation of venireperson Hough was conducted separately in chambers and the rest in the presence of the other veniremen. At the conclusion of the separate questioning, defense counsel asked that Hough be stricken for cause. Defense counsel said, "I don't have any problem with the publicity part, just that she would vouch for this woman she has known for 10 years and who happens to be the state's main witness and only eyewitness to the crime." The court did not rule on the challenge at that time.

At the conclusion of voir dire, defense counsel asked that Hough be stricken for cause because "she knows Judy Perryman who is the only eyewitness the state will be calling, and she indicated she had vouched for Judy Perryman on previous occasions and helped her get a job, and would give great weight to her testimony."

The prosecutor responded as follows:

I think the words "vouched for Judy Perryman's credibility" were the defense counsel's words, and perhaps she assented; but she did say, I think, in response to my question, that even though she knew of Judy Perryman, and in fact we discussed this not only in chambers but here in the open courtroom, and she once again stated that that mere knowledge of Judy Perryman would not affect her. She could be fair. We would object to challenging that venire person.

 A defendant is entitled to a full panel of qualified jurors before making peremptory challenges. *State v. Schnick*, 819 S.W.2d 330, 333 (Mo. banc 1991). It is prejudicial error to deny a meritorious challenge for cause, and this is true even if an unqualified juror does not actually serve. The right to have a list of qualified jurors from which to make peremptory strikes does not arise from the Constitution. The right is the product of statutes, including §§ 494.470 and 494.480 enacted in 1989 and

in effect at the time of the instant trial. *Id.* at 334.

In *State v. Smith,* 649 S.W.2d 417, 422 (Mo. banc 1983), the court said:

A clear line cannot be drawn for all cases as to when a challenge for cause should be sustained; there will be instances in which an appellate court might have done differently but cannot say there was an abuse of discretion; each case must be judged on its particular facts; a determination by the trial judge of the qualifications of a prospective juror necessarily involves a judgment based on observation of his demeanor and, considering that observation, an evaluation and interpretation of the answers as they relate to whether the venireman would be fair and impartial if chosen as a juror. Because the trial judge is better positioned to make that determination than are we from the cold record, doubts as to the trial court's findings will be resolved in its favor. (Authorities omitted.)

■ The trial court possesses broad discretion in determining the qualifications of prospective jurors, and its ruling on a challenge for cause will not be disturbed on appeal unless it constitutes a clear abuse of discretion and a real probability of injury to the complaining party. *State v. Feltrop,* 803 S.W.2d 1, 7[3] (Mo. banc 1991). The critical question is whether the challenged venireman unequivocally indicates his ability to evaluate the evidence fairly and impartially. *Id.* at 7; *State v. Lingar,* 726 S.W.2d 728, 734 (Mo. banc 1987). A more searching review by the appellate court is justified when the trial court did not conduct an independent examination of the venireperson. *Feltrop,* at 7.

■ A venireperson is not automatically excluded for cause because he may have formed an opinion based on publicity. *Feltrop,* at 8. Initial reservations expressed by a venireperson do not determine his qualifications. It is necessary to consider the entire voir dire examination of him. *Feltrop,* at 8; *State v. Johnson,* 722 S.W.2d 62, 65 (Mo. banc 1986). The question is not whether a venireperson holds

opinions about the case, but whether these opinions will yield and he will determine the issues under the law. *Feltrop,* at 8. If a venireperson demonstrates an ability to be fair and to follow the law and instructions of the court, the trial court does not abuse its discretion in overruling a challenge for cause. *Id.*

■ In determining the existence of bias or prejudice, the test is whether an opinion held by a venireman will readily yield to the evidence in the case and the juror will determine the issues upon the evidence adduced in court, free from bias. *State v. Leisure,* 749 S.W.2d 366, 372 (Mo. banc 1988). Whether bias or prejudice exists is a finding of fact, the determination of which "is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984); *Leisure, supra,* at 372. The trial judge is in the best position to assess the totality of a person's responses on voir dire. *Id.* at 375. "In determining when a challenge for cause should be sustained, each case must be judged on its own facts." *State v. Stewart,* 692 S.W.2d 295, 298 (Mo. banc 1985). "Errors in the exclusion of potential jurors should always be made on the side of caution." *Id.*

In *State v. Wacaser,* 794 S.W.2d 190 (Mo. banc 1990), the state argued that the court should adopt the "Oklahoma rule," under which a defendant cannot establish reversible error in the overruling of a meritorious challenge for cause unless the defendant is forced to accept the challenged juror. Under the Oklahoma rule, there is no prejudice if the challenged juror is removed by defendant's peremptory challenge, as was done here with respect to venireperson Hough. Rejecting the state's request that the Oklahoma rule be adopted, the court said, at 193: "We decline to depart from our long established standards, grounded on our statutes and confirmed in decisions, in favor of a holding that would severely dilute the value of peremptory challenges." The court also said, at 193–194:

The state also points to the large number of reversals for failure to sustain

meritorious challenges for cause. The cure for this problem, as we have often said (see [*State v. Hopkins,* 687 S.W.2d 188 (Mo. banc 1985); *State v. Stewart,* 692 S.W.2d 295 (Mo. banc 1985) ] ), lies in trial judges freely excusing jurors for cause when there are plausible challenges and also, perhaps, in prosecutors being less aggressive in trying to keep jurors whose answers indicate that challenges for cause might have merit.

Similarly, in *State v. Stewart, supra,* at 299, the court said: "Trial judges should sustain challenges to jurors whose responses make questionable their impartiality. The time saved by not doing so is not worth the serious risk it involves to defendant's right to an impartial jury, which, if violated, inevitably results in having to try the case over again."

In *State v. Walton,* 796 S.W.2d 374, 378 (Mo. banc 1990), the court said:

> A prolonged friendship by a venireman with a witness for a party, of itself, does not sustain contention that the refusal of the challenge for cause by the trial court was an abuse of discretion—absent a clearly drawn prejudice. In addition, prior knowledge about a case does not, per se, require that a potential juror be stricken when such knowledge does not preclude them from reaching a verdict based upon the evidence. Familiarity with some of the facts of a case without formation of an opinion as to guilt or innocence does not disqualify a juror. (Authorities omitted.)

Prospective jurors "rarely speak in absolutes" when responding to questions on voir dire. *State v. Schwer,* 757 S.W.2d 258, 263 (Mo.App.1988); *State v. Pride,* 567 S.W.2d 426, 433 (Mo.App.1978). Referring to a venireman's response, "I don't think so," the court said, in *State v. Mercer,* 618 S.W.2d 1, 7 (Mo. banc 1981), that the response "is not equivocal in its context; it is common vernacular to express a negative."

It is unclear what was meant by the affirmative response of Hough to this leading question of defense counsel: "You would vouch for her?" The American Heritage Dictionary of the English Language

(1973), defines "vouch" as follows: "tr. 1. To substantiate by supplying evidence; verify.... intr. 1. To furnish a guarantee; give personal assurance. Used with *for.*"

In other portions of her voir dire examination, Hough stated: she did not think she had formed any opinion, based on the "stuff" that she had heard; she would try to be a fair juror and just listen to the evidence; she did not think that her acquaintanceship with any of these people would cause her difficulty in being fair and impartial to either side; she could be fair and impartial to the best of her ability and would try; she did not think that if defense counsel "came down pretty hard" on Perryman it would tend to grate her just a little bit; she would try to be real fair; if Perryman said something "one way and other witnesses that the defense put on said something opposite," she would make the decision that she thought was right, not based on her prior knowledge of Perryman; she would listen to the facts; she thought she could completely disregard her prior relationship with Perryman and all her good feelings about her and she would try to make her decision by the good book.

This court holds that the trial court did not clearly abuse its broad discretion in denying defendant's challenge for cause to venireperson Hough. Defendant's first point has no merit.

■ Defendant's second point is that the trial court erred in overruling her objection "to the testimony of defendant's divorce attorney, Jack Miller, because Miller was incompetent to testify under § 491.-060(3) in that his testimony concerned communications made between him and his client, defendant, during the course of his representation of defendant, and defendant did not waive the privileged character of the communications by testifying that she was unsatisfied with the divorce proceedings and Miller's representation because she did not testify as to privileged communications with Miller." The point further states that the error deprived defendant of her rights to "due process" and a fair trial.

The statement of facts portion of defendant's brief makes no mention of attorney Miller or his testimony, nor does it mention any portion of defendant's testimony concerning "Miller's representation."

"The statement of facts shall be a fair and concise statement of the facts relevant to the questions presented for determination without argument." Rule 30.06(c). With exceptions not applicable here, Rule 30.20 provides that allegations of error that are not properly briefed on appeal shall not be considered by the appellate court. This court, in its discretion, examines defendant's second point for possible plain error within the meaning of Rule 30.20, which permits such review for plain errors affecting substantial rights when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.

Before attorney Miller gave the challenged testimony, defendant produced the testimony of Miller's legal secretary, Cheryl Foltz, who testified that Miller represented defendant in the divorce proceeding and that defendant was frequently at Miller's office.

Testifying in her own behalf, defendant, under examination by her own counsel, gave the following testimony: "I was not happy with attorney Miller; I had talked to him about ex parte orders, and Miller kept saying, 'No, no, we've got time'; Miller discussed with me the contents of a work sheet which the judge in a divorce case had sent with respect to the proposed findings; Miller told me that the judge did not divide all the property; I told Miller to appeal immediately." Under cross-examination by the prosecutor, defendant gave the following testimony without objection: "My daughter Kathy was present through the divorce trial; Kathy was standing there during my conferences with Miller at the divorce trial; Kathy was just giving me support."

In defendant's argument under her second point, she states that under examination by the prosecutor, attorney Miller testified "as to information that Evelyn had given him and his advice to her concerning the divorce." The "information" alluded to

is not set forth, although three pages of the five-volume transcript are cited. On the cited pages, attorney Miller, under direct examination of the prosecutor and during the state's case on rebuttal, testified as follows: On the morning of the trial of the divorce case, John Shire's attorney made a very substantial offer which Miller communicated to defendant in the presence of defendant's daughter; defendant was not interested in the offer and said she wanted the farm; there was discussion about the custody of the son Michael, age 16, and Michael was opposed to defendant getting custody of him; Michael's custody "was not an issue based on his age and based on his desire"; defendant was very upset at the court's ruling when she found out that she could have gotten more in the settlement.

In State v. Carter, 641 S.W.2d 54, 57 (Mo. banc 1982), the court said:

The attorney-client privilege is created by statute. Section 491.060(3), RSMo 1978, makes an attorney incompetent to testify "concerning any communication made to him by his client in that relation, or his advice thereon, without the consent of such client." The privilege is the client's to claim and runs from the client to the attorney. The privilege is limited to communications between the attorney and the client. It operates only to render the attorney incompetent to testify to confidential communications made to him by a client. (Citing authorities.)

■■■ The privilege is not waived by the reason of the presence of a third person if the third person is the confidential agent of either the attorney or the client. State v. Fingers, 564 S.W.2d 579, 582 (Mo.App. 1978). The presence of a third person, however, such as a relative or friend of the client, who is not essential to the transmission of information or whose presence is not reasonably necessary for the protection of the client's interest, will vitiate the privilege. Id. To similar effect see State v. Longo, 789 S.W.2d 812, 815[1] (Mo.App. 1990); State v. Mansfield, 668 S.W.2d 271, 273[4] (Mo.App.1984). Testimony by an attorney merely stating his observation of

the client's mental condition, as distinguished from disclosure of any private communications, does not violate the attorney-client privilege. *Underwood v. State,* 553 S.W.2d 869, 871[1] (Mo.App.1977).

This court holds that the challenged testimony was not protected by the attorney-client privilege because of the presence of defendant's daughter. It is unnecessary to consider whether defendant's own testimony constituted a waiver of the attorney-client privilege and was an independent basis for its admissibility. Defendant's. second point has no merit.

■ Defendant's third point is that the trial court erred in refusing to receive into evidence defendant's diary, Exhibit 175, over the state's objection, in that the diary was relevant to defendant's mental state in the weeks prior to the shooting, and "was probative to her defense of mental disease or defect and did not constitute self-serving hearsay."

In the trial court, defense counsel, referring to Exhibit 175, stated that it "appears to be a rather thick diary consisting of about 35 pages." Defendant did not specifically identify Exhibit 175 as her diary. She did say that at some unstated date she stopped keeping the diary.[2]

Exhibit 175 has not been filed in this court. Defendant has filed a 27–page document, portions of which are illegible. It is accompanied by an affidavit of her attorney in the trial court, which states, in relevant part: "The attached copy is a true and accurate copy of the original; to the best of my knowledge, on information and belief, the original exhibit is no longer available."

■ An objection to the admissibility of exhibits need not be considered on appeal if the exhibit is not filed with the court. *State v. Simms,* 810 S.W.2d 577, 582[9] (Mo.App.1991). "Any exhibits not filed on or before the day of argument may be considered by the court as immaterial to the issues on appeal." Rule 30.05. In *State v. Reynolds,* 782 S.W.2d 793 (Mo.

App.1989), defendant contended that the trial court erred in receiving into evidence a certain photograph. The exhibit was not filed in the court of appeals. The court pointed out it was defendant's burden as appellant to supply the court with a sufficient record to review the point and that failure to do so required that the point be denied. In *State v. Simpson,* 779 S.W.2d 274, 283[15, 16] (Mo.App.1989), defendant claimed that the trial court erred in denying his request to pass to the jury two letters which were defense exhibits. The exhibits were not filed in the appellate court. The court said, at 283:

> If a party wishes us to consider the relevancy or the admissibility of a proffered exhibit, it is his duty to furnish the exhibit to us before the cause is submitted, so that we will have some factual basis for our determination. Since Simpson did not do so, his point of claimed error was not properly preserved.

Even if it is assumed, arguendo, that the document filed here is an accurate copy of Exhibit 175 and that it was a diary made by defendant over a period which ended some indefinite time prior to the commission of the offense, the trial court did not err in rejecting it. "A defendant is not permitted to create evidence by adducing testimony of his own self-serving act or declaration which is independent of the res gestae of the crime." *State v. Brooks,* 360 S.W.2d 622, 627[8] (Mo.1962). To similar effect see *State v. Nelson,* 459 S.W.2d 327, 332[6] (Mo.1970); *State v. O'Neal,* 436 S.W.2d 241, 244[2] (Mo.1968); *State v. Cooksey,* 787 S.W.2d 324, 328[9] (Mo.App.1990); *State v. McIntyre,* 654 S.W.2d 188, 190[3] (Mo.App.1983); *State v. Washington,* 632 S.W.2d 261, 262[1] (Mo.App.1982); *State v. Walker,* 616 S.W.2d 89, 92–93[9] (Mo.App. 1981). In most of these cases, the self-serving declaration was made after the offense. In *Brooks,* the self-serving declaration was made two months before the offense.

---

**2.** At the postconviction hearing, defendant's trial counsel, during questioning by defendant's postconviction counsel, testified: "We don't know when [the diary] ended, but I think it ended several months prior to the shooting, maybe in June."

In *United States v. Hedgcorth*, 873 F.2d 1307 (9th Cir.1989), a defendant contended that the trial court erred in sustaining the government's hearsay and relevance objections to material written by the defendant. Defendant argued that the writings were admissible under the state of mind exception to the hearsay rule. Rejecting that argument, the court said that defendant's prior writings had no bearing on his state of mind during the commission of the offenses "years later." Defendant's third point has no merit.

Defendant's fourth point is that the trial court committed plain error in giving Instruction 4, based on MAI–CR.3d 302.04, in that the instruction erroneously defined "reasonable doubt." In *State v. Blankenship*, 830 S.W.2d 1, 13[14] (Mo.banc 1992), the court rejected the same contention and said, "The instruction has been repeatedly upheld." The court cited several of its prior decisions so holding. Defendant's fourth point has no merit.

The judgment is affirmed.

### Case No. 18063

Movant's sole point is that she was entitled to relief on her Rule 29.15 motion, and the trial court erred in ruling otherwise, because movant was denied effective assistance of counsel in that her trial counsel failed to call Wayne McKay and Virginia Street as defense witnesses. Movant asserts that she was prejudiced because the testimony of the two witnesses would have been relevant and helpful to the defense and that if the witnesses had been produced, there is a reasonable probability that movant would have been acquitted.

 Appellate review of the trial court's ruling on a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the trial court are clearly. erroneous. Rule 29.15(j). To prevail on a claim of ineffective assistance of counsel, movant must demonstrate that his trial counsel failed to show the customary skill and diligence that a reasonably competent attorney would provide and that he was prejudiced due to the deficient performance. *Strickland v. Washington*, 466

U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *Kennedy v. State*, 771 S.W.2d 852, 857 (Mo.App.1989). To demonstrate prejudice, the movant must show that the attorney error changed the outcome of his trial. *Kennedy*, at 857. The movant must also overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065; *Kennedy, supra*, at 857. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

 Movant had the burden to show that the witnesses could have been located, that they would have testified if called, and that their testimony would have provided a viable defense. *State v. Leisure*, 838 S.W.2d 49, 58 (Mo.App.1992). The choice of witnesses, however, is a matter of trial strategy and, ordinarily, will not support a claim of ineffective assistance of counsel. *Id.* See also *Young v. State*, 761 S.W.2d 725, 728 (Mo.App.1988). The appellate court presumes that counsel's decision not to call a witness is a matter of trial strategy and not a basis for overturning a conviction unless movant clearly establishes otherwise. *State v. Patterson*, 826 S.W.2d 38, 41 (Mo.App.1992); *Harry v. State*, 800 S.W.2d 111, 115 (Mo.App.1990); *State v. Meadows*, 785 S.W.2d 635, 643 (Mo.App. 1990).

 Witnesses at the motion hearing included Wayne McKay, Virginia Street, and movant's trial counsel Dee Wampler. Movant's brief states:

Wayne McKay testified that he had known Evelyn about six years before the shooting. Evelyn would come to his house to use the phone to call the sheriff when John would hassle her. She acted "scared" and babbled. He testified that John was not living at the farm before the shooting and Evelyn was. McKay's wife testified at the trial, but he did not.

Virginia Street was Evelyn's "best friend." Evelyn told her about the phys-

ical abuse she received from John and showed her her bruises. Evelyn had told her the divorce was not final because she had filed an appeal. Street was under subpoena, but Wampler did not call her to testify.

Wayne McKay also testified that at the time of the trial he was "sort of laid up," and he did not remember whether he was in the hospital or not. He also said that his wife testified at the trial and that "I don't have anything to tell the court that my wife wouldn't know about. We two pretty well knew the same things about the defendant."

Virginia Street testified that prior to the trial she was interviewed by Dee Wampler for "maybe an hour" and gave him a 16-page typed statement. She said that she was subpoenaed to testify and was present on the day of the trial but did not testify.

Attorney Wampler testified that Wayne McKay and his wife Ginger were good friends of the defendant and that he chose Mrs. McKay "as being the stronger of the witnesses." He said that he had interviewed Virginia Street and that she had seen the defendant at various stages during the divorce proceeding. He said, "It's not quite as good as what you might think. I think [Street] said that she hadn't seen [defendant] for a period of time, two or three months she never saw her." He also testified that Virginia Street did not testify because "[Street] worked both ways. She had good and bad. Also, her testimony was cumulative." He said that he and the defendant went over the list of witnesses and decided not to call Street.

The trial court found that McKay was very ill at the time of the trial and that his wife did testify to the same matters to which McKay would have testified. The trial court also found that although Street's testimony might have been helpful, movant failed to show that she was prejudiced by her non-production. The trial court also found: "Movant failed to prove that witnesses were not called for any inappropriate reasons."

This court holds that the findings and conclusions of the trial court, denying mov-

ant relief with respect to potential witnesses McKay and Street, are not clearly erroneous and, indeed, are fully supported by the record. McKay's point has no merit.

The judgment is affirmed.

MONTGOMERY, P.J., and PREWITT, J., concur.