STATE of Missouri, Respondent,

v.

Henrietta TIDWELL, Appellant.

No. 19445.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 8, 1994.

George W. Gilmore, Jr., Sikeston, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Fernando Bermudez, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Defendant, Henrietta Tidwell, guilty of murder in the first degree, § 565.020, RSMo Cum.Supp.1990, and assessed punishment at imprisonment for life without eligibility for probation or parole. The trial court entered judgment per the verdict.

Defendant appeals, maintaining the trial court erroneously received in evidence (1) a vial of Defendant's blood, and (2) items seized and photographs taken inside her home.

Although Defendant does not dispute the sufficiency of the evidence to support the verdict, resolution of her claims of error requires an account of a substantial part of the evidence. In narrating it, we are mindful that the facts and reasonable inferences arising therefrom are to be stated favorably to the trial court's rulings. *State v. Blankenship*, 830 S.W.2d 1, 14[18] (Mo. banc 1992).

So viewed, the evidence established that on Friday, December 11, 1992, Defendant, then age 63, was living alone in a four-room house on highway 53 between Poplar Bluff and Qulin. Defendant's sister, Elizabeth Harper, then age 73, lived in Poplar Bluff. Sherry Jenkins, a niece of Defendant and Ms. Harper, lived on highway 53 a half mile past Defendant's house, nearer Qulin.

About 9:30 p.m., that date, Sherry drove by Defendant's house and noticed Ms. Harper's automobile parked in front.

About 8:30 the following morning, Sherry and her husband drove to Poplar Bluff. As they passed Defendant's house, Ms. Harper's automobile was still there. Sherry and her husband drove back by Defendant's house about 1:30 p.m., that day, and Ms. Harper's automobile was still there. This time, Sherry "saw a body laying out in the yard."

Sherry and her husband drove to the nearby home of Sherry's brother, Mike Tidwell, and Sherry told him what she had seen. Mike accompanied Sherry and her husband to Defendant's house. Mike and Sherry looked at the body and recognized it was Ms. Harper. Sherry went to the home of a nearby relative, who telephoned the Butler County sheriff's office.

Deputy Sheriff Gary Hobbs was dispatched to Defendant's house. As Hobbs approached it, Mike Tidwell "flagged him down." Mike told Hobbs one of his (Mike's) aunts was in Defendant's yard, apparently dead, and he "didn't know where the other one was." Mike testified, "I told [Hobbs] I didn't know if the other one was in the house dead or was in there with a gun, what the deal was."

Hobbs went to the body, checked it for pulse, and found none. He returned to his vehicle and radioed for assistance.

Deputy Sheriff Jim Keown arrived. He and Hobbs ascended Defendant's front porch and approached the door, pistols drawn. Hobbs knocked. He heard movement inside. He knocked again. Defendant opened the door.

Hobbs asked Defendant to step outside. She complied and was immediately hand-cuffed. Hobbs asked Defendant if anyone was inside. Defendant did not reply.

Hobbs entered the house. He saw a butcher knife on the kitchen table and a dishpan of water at the sink. He found no one in the house, so he instructed Keown to bring Defendant inside. Hobbs then advised Defendant "of her rights."

The third officer to arrive was Deputy Sheriff Mike Harper, the evidence technician and crime scene processor for the sheriff's office. He got there at 2:20 p.m. By then, an ambulance had arrived and the "EMT's" were attending the body.

Keown was outside Defendant's house when Harper arrived. Hobbs was inside with Defendant. Keown briefed Harper on the situation. Harper then "roped off the yard" to keep onlookers away.

Harper noticed a "trail" of what he believed was "blood and tissue" from the porch to the body.

Inside Defendant's house, Harper photographed the knife on the kitchen table, then took possession of it. He also photographed several areas where he saw what he believed were blood spots.

Deputy Sheriff Dick Law arrived around 2:30 p.m. Sheriff Bill Heaton arrived shortly after Law. Heaton and Hobbs questioned Defendant, but she did not respond. Sometime between 3:00 and 3:30 p.m., Law, at Heaton's direction, took Defendant to jail.

Harper then began "processing inside the residence." As we read his testimony, "processing" included collecting specimens from the suspected blood spots by using "cotton swabs."

The evidence obtained inside Defendant's house is the subject of her second point. It reads:

"The Trial Court erred in admitting into evidence Exhibits 13, 14, 15, 15A, 15B, 15C, 16, 17, 18, 19, 20, and 24 because all of these Exhibits were obtained as a result of an unlawful search of Defendant's home in that the Exhibits were obtained as a result of a warrantless search in violation of the Fourth Amendment, U.S.C.A. Const. Amend. 4."

Describing the exhibits and recounting the facts pertinent to the claim of error is difficult because (a) the exhibits have not been filed with us, and (b) the record yields few details as to the sequence in which the evidence was assembled.

Facing these circumstances, we note that inasmuch as the exhibits have not been filed with us, we may consider them immaterial to the issues on appeal. Rule 30.05.[1] An objection to the admissibility of an exhibit need not be considered on appeal if the exhibit is not filed with the appellate court. *State v. Shire*, 850 S.W.2d 923, 932[15] (Mo.App.S.D. 1993); *State v. Simms*, 810 S.W.2d 577, 582 (Mo.App.E.D.1991). Indeed, the Supreme Court of Missouri held (in a double murder case) that there was nothing to review with respect to a contention that photographs were erroneously received in evidence where the photographs were not included in the record on appeal. *State v. Richter*, 647 S.W.2d 513, 520[9] (Mo. banc 1983).

■■■ However, because of the gravity of the crime and sentence here, we have chosen to review Defendant's second point *ex gratia* for plain error. Plain error relief is appropriate only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice results. *State v. Isa*, 850 S.W.2d 876, 884[2] (Mo. banc 1993). The accused bears the burden of showing that an alleged error produced manifest injustice. *Id.* at 884[3]. Mere allegations of error and prejudice will not suffice. *Id.*

Law testified Harper "began to photograph the crime scene" while Law (and, obviously, Defendant) were there. Some photographs were taken outside Defendant's house and are not in issue.

As appears *infra*, seven of the exhibits identified in Defendant's second point are photographs Harper took inside the house. With the exception of Exhibit 13, the record does not demonstrate whether he took the photographs before or after Law took Defendant away.

With that preface, we now endeavor to describe the exhibits listed in Defendant's second point to the extent necessary for plain error review.

Exhibit 13. A photograph of "the floor area between the kitchen and living room." According to Harper, "[W]e pulled [tile] back to take blood samples from the floor." It is inferable this was done after Defendant was taken away, as Harper testified, "[Defendant] was not present inside the residence during the time that I was processing inside the residence."

Exhibit 14. A photograph of the "wall and doorway between the kitchen and living room area."

Exhibit 15. A photograph of the "door frame and door facing between the kitchen and living room." According to Harper, the photograph shows what he believed were "blood spatters or blood on the door frame." Harper removed the door frame so it could be "taken to the lab." He explained, "I could probably have lifted the blood off the paneling and taken the sample to the lab, however, any time I get into a situation where I can let the lab lift the sample they have a better way of doing it."

Exhibit 15A. The door frame shown in Exhibit 15.

Exhibit 15B. A piece of paneling Harper removed in the "kitchen-living room doorway area."

Exhibit 15C. A smaller piece of paneling Harper removed "beside the door frame of the kitchen."

Exhibit 16. A photograph of "the tile area ... in the ... doorway of the living room kitchen area." Harper explained the photograph showed how he was using the cotton swabs to take blood samples.

Exhibit 17. A photograph of "the floor between the kitchen and living room area showing the two different types of tile."

Exhibit 18. A photograph of "the doorway between the living room and front bedroom." Harper explained the photograph showed what he believed to be a spot of blood on the floor, beside which he placed a ruler to show the size.

1. Rule references are to Missouri Rules of Criminal Procedure (1993).

Exhibit 19. A photograph of "the front door sill area between the wooden door and storm door showing what [Harper] believed to be ... a spot of blood on the door sill."

Exhibit 20. The knife seen by Hobbs on the kitchen table when he entered Defendant's house. As reported earlier, Harper seized it after photographing it.

Exhibit 24. A box containing the cotton swabs used by Harper to collect blood specimens. As we comprehend the record, a serologist who tested the swabs found type O human blood on four of them.[2] The serologist found blood on another, but could not determine whether it was human.

The serologist also found type O human blood on a piece of bone fragment, tissue and hair found by Harper inside Defendant's house (the record is unclear as to the precise location). Additionally, the serologist found type O human blood on Exhibits 15A, 15B, 15C and 20.

The victim had type O blood.

Before trial, Defendant filed a motion to suppress all evidence obtained from her house. The motion raised the Fourth Amendment objection asserted in Defendant's second point. After an evidentiary hearing, the trial court denied the motion.

At trial, Defendant preserved the Fourth Amendment objection to all exhibits listed in her second point except Exhibit 20 (the knife). Defendant did register an objection to it, but not on Fourth Amendment grounds. (Earlier in the trial, Exhibit 9, a photograph of the knife as it lay on the kitchen table, was received in evidence without objection.)

■ When a pretrial motion to suppress evidence is filed and denied, the accused must, in order to preserve the issue for appellate review, make a specific objection to the items when they are offered in evidence at trial. *State v. Yowell,* 513 S.W.2d 397, 402–03[2] (Mo. banc 1974); *State v. Elliott,* 845 S.W.2d 115, 118[1] (Mo.App.S.D.1993).

A point on appeal regarding admissibility of evidence must be based on the theory of the objection made at trial. *State v. Lang,* 515 S.W.2d 507, 511[8] (Mo.1974). An accused is not permitted on appeal to broaden the objection he presented to the trial court; he may not rely on a theory different than the one offered at trial. *State v. Dampier,* 862 S.W.2d 366, 376[14] (Mo.App.S.D.1993); *State v. Bostic,* 789 S.W.2d 804, 807[1] (Mo. App.W.D.1990).

Because Defendant made no Fourth Amendment objection to Exhibit 20 when the prosecutor offered it at trial, we eliminate that exhibit from our plain error review of Defendant's second point.

■ Defendant does not dispute the premise that if exigent circumstances exist, entry into an accused's home without a warrant is permissible to search in emergency situations in response to a need for help. *State v. Butler,* 676 S.W.2d 809, 811[1] (Mo. banc 1984), citing *State v. Epperson,* 571 S.W.2d 260 (Mo. banc 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979).

■ When Hobbs entered Defendant's house, he knew Defendant's sister lay dead in Defendant's yard. Hobbs had seen lacerations on the victim's head, and blood, when he looked at the body upon arrival. As noted earlier, when Hobbs confronted Defendant and asked whether anyone was inside, Defendant did not reply.

We hold these facts constituted exigent circumstances under which Hobbs could lawfully enter Defendant's house, without a warrant, to determine whether (a) there were other victims inside needing help, or (b) the killer was inside, a source of potential danger to the officers (and possibly Defendant).

Hobbs' lawful entry did not become unlawful merely because he found no one in the house. In *Smith v. State,* 419 So.2d 563 (Miss. banc 1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983), offi-

---

**2.** Those four were referred to at trial as items "12–A," "12–B," "12–C" and "12–F." We gather from the transcript that the specimens on those swabs came from the following sites:

12–A, floor in doorway between living room and kitchen;

12–B, front door sill;

12–C, floor in doorway between living room and bedroom;

12–F, floor between kitchen and living room.

cers entered the accused's apartment under exigent circumstances (a belief that a female robbery victim might be there, alive and in need of immediate assistance). 419 So.2d at 571. The officers observed articles of women's clothing and other items, but failed to find the victim. They departed after some four minutes, and a short time later found the victim, dead, in a ditch some fifty yards distant. Crime lab technicians then entered the accused's apartment and gathered various items which incriminated him. The Supreme Court of Mississippi held the items admissible, pointing out that when such items were first discovered, the immediate objective was finding the victim, not collecting evidence. The opinion continued:

> "The actions of . . . members of the mobile crime lab (after the re-entry of the apartment) were merely to effectuate the physical seizure of articles in plain view which [the officers who originally searched the apartment] would have been able to seize had not the circumstances been so 'exigent'. There was no unwarranted delay in time, nor was there any expansion of the scope of the search. The fact that the actual physical taking of the items into the custody of the police was effectuated by an evidence technician who was trained to preserve the evidentiary value of the objects, rather than by the first officers to view the objects, is not significant."

419 So.2d at 572.

The instant case is similar to *Smith* in that the first officer who entered Defendant's house (Hobbs) did so under exigent circumstances, found no one, but did see items of evidentiary value—the knife on the kitchen table and the dishpan of water.[3] Like *Smith*, no evidence was seized in Defendant's house by the officer who entered under exigent circumstances. As in *Smith*, the evidence here was gathered by an evidence technician after the crisis was over.

The record supplies no clue about whether Hobbs, during his exigent circumstances search, saw all (or any) of the blood spots Harper saw. Harper was asked whether someone lacking his training would have noticed the blood spots while walking through the house. Harper replied: "[I]t would be your definition of plainly visable [sic]. Some were and some weren't. It was visable [sic] to me because I knew what I was looking for. The average person may have noticed something red, but they may not have been able to put it together."

Be that as it may, the evidence, viewed favorably to the trial court's denial of Defendant's motion to suppress, supports an inference that Harper, in "processing" the interior of Defendant's house, did not go beyond the areas inspected by Hobbs during his exigent circumstances search and did not, except in the instances noted in the next two paragraphs, move anything to obtain any exhibit listed in Defendant's second point.[4]

As recounted earlier, Exhibit 13, a photograph, showed how Harper pulled tile back to take blood samples from the floor. However, he testified: "You could see [blood spots] there anyway. It was just easier to collect if I pull it back. It was between the cracks."

Exhibits 15A, 15B and 15C are segments of door frame and paneling Harper removed so the blood spots on them could be lifted at a laboratory instead of by him at the crime scene. According to Harper, the laboratory could do it better. The record amply supports an inference that the spots on these items were in plain view; that is, Harper did not have to move anything to see them.

Defendant maintains the exhibits listed in her second point were inadmissible because no exigent circumstances existed when Harper arrived at her house. By then, Hobbs had completed his search and found no one.

Defendant relies principally on *State v. Rogers*, 573 S.W.2d 710 (Mo.App.1978). There, police entered a residence, shared by

---

3. The prosecutor argued that the dishpan of water, along with some "wet rags" Harper saw in the kitchen, indicated Defendant had been cleaning the house to remove the victim's blood.

4. Harper discovered a hammer inside a kitchen cabinet and seized it. When the prosecutor offered the hammer in evidence at trial, Defendant registered a Fourth Amendment objection. The trial court sustained the objection and excluded the hammer.

the accused and others, in response to a report that a dead body was there. The officers found two small children (alive) and the body. The officers summoned an ambulance, entrusted the children to a neighbor, then began questioning people gathered outside. At that point, the house was empty.

About a half-hour later, officers began searching inside the house, an operation that took three and a half hours. They searched behind a heater, through the trash in the kitchen, and inside kitchen cabinets, seizing items in all those locations. The *Rogers* court acknowledged *Epperson*, 571 S.W.2d 260, and *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), where officers entered premises under exigent circumstances and discovered evidence which was held admissible, but the *Rogers* court concluded those cases did not apply. The opinion explained:

"[U]nlike *Tyler* and *Epperson*, the emergency which prompted and justified the initial entry had run its course when the evidence was discovered—the premises were clear of persons, victims or killers so that there was no longer danger to the police or threat of loss of evidence. ... unlike *Tyler* and *Epperson*, the evidence taken was not found in plain view incident to an emergency investigation, but in hidden places incident to deliberate and systematic search after the excuse of exigency had passed.

... Those items in plain view to the police in the course of their legitimate emergency activity may be taken as evidence. That which is in open view when taken is not the product of a search. And that evidence may be used to convict a person against whom the charge is brought."

*Rogers*, 573 S.W.2d at 716–17 (citations omitted).

Here, unlike *Rogers*, there is no indication that Harper obtained any of the evidence listed in Defendant's second point from anyplace that was not in Hobbs' plain view during the exigent circumstances search. It is thus arguable that the evidence here was admissible under *Epperson* and *Tyler*.

However, we need not decide that question. As noted earlier, in our plain error review of Defendant's second point, we decide only whether the receipt in evidence of the exhibits listed there resulted in manifest injustice or a miscarriage of justice.

In *State v. Jolley*, 312 N.C. 296, 321 S.E.2d 883 (1984), *cert. denied*, 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 816 (1985), the accused fatally shot her husband in their home, then immediately phoned for help. A rescue squad and a law enforcement officer responded. The officer entered and saw a rifle six feet from the victim, who was being attended by rescue technicians. The officer escorted the accused to his patrol car, then secured the residence. Other officers arrived, and one entered the residence. He saw the rifle and also found some spent cartridges and shells. After six hours in the residence, the officer took possession of those items.

The Supreme Court of North Carolina held the rifle admissible in evidence. The opinion said:

"We hold that when a law enforcement officer enters private premises in response to a call for help and thereby comes upon what reasonably appears to be the scene of a crime, and secures the crime scene from persons other than law enforcement officers by appropriate means, all property within the crime scene in plain view which the officer has probable cause to associate with criminal activity is thereby lawfully seized within the meaning of the fourth amendment. Officers arriving at the crime scene thereafter and while it is still secured can examine and remove property in plain view without a search warrant."

321 S.E.2d at 886[1].

That is essentially what occurred here. Although the record does not establish how long Harper was at Defendant's house, the record confirms he began photographing while Defendant was still there and it is inferable he finished processing within a reasonable time and while Defendant's house was secured by Hobbs and other officers. Comparing the instant case to *Jolley*, above, and to *Tyler*, 436 U.S. 499, 98 S.Ct. 1942, *Epperson*, 571 S.W.2d 260, and *Smith*, 419 So.2d 563, we hold the facts here are close

enough to those cases that the receipt in evidence of the exhibits listed in Defendant's second point did not result in manifest injustice or a miscarriage of justice. It follows that Defendant's second point supplies no basis for reversal.

■ Defendant's first point asserts the trial court erred in receiving in evidence a vial of Defendant's blood (Exhibit 27). Defendant maintains the blood was taken from her without a valid court order and in violation of Rule 25.06.

On February 10, 1993, while the case awaited a preliminary hearing before an associate circuit judge, the docket sheet shows:

"Motion for Discovery for State to Obtain blood, hair & saliva samples."

We find no copy of the motion in the record. However, the docket sheet shows that on February 22, 1993, the State and Defendant appeared by counsel and argued the motion. The judge granted it.

Weeks later, a preliminary hearing was held. The judge found probable cause to believe the crime charged had been committed and Defendant committed it. The judge bound Defendant over for further proceedings. An information charging Defendant with murder in the first degree was filed June 7, 1993. At that time, no blood had been taken from her.

Trial was eventually scheduled for January 12, 1994.

Although the record is sketchy, it shows the prosecutor moved for a continuance on January 5, 1994. The trial court discussed the request with the prosecutor and Defendant's lawyer by phone. The trial court stated on the record that the reason the prosecutor requested the continuance was to obtain a sample of Defendant's blood for testing. Defendant's lawyer acknowledged that was the reason the prosecutor requested the continuance. The trial court granted the request and rescheduled trial for February 3, 1994. Trial began that date.

Sometime between January 5, 1994, and trial, a registered nurse at a hospital drew a sample of blood from Defendant. The sample became Exhibit 27. The serologist tested

the contents of Exhibit 27, determined it was type A blood, and so testified at trial.

Rule 25.06 reads, in pertinent part:

" . . .

(B) Upon motion by the state, and subject to constitutional limitations and any other safeguards deemed appropriate by the court, and upon a showing of good cause, the court may order the defendant to:

.        .        .        .        .

(8) Submit to the taking of samples of the defendant's blood ...

.        .        .        .        .

(C) If requested by any party, the court shall hear evidence on the necessity of discovery requested under Rule 25.06(B).

.        .        .        .        .

(G) Rule 25.06(B) shall not apply to investigative procedures before an indictment or information is filed."

Defendant objected to Exhibit 27 at trial because (1) the order allowing the taking of her blood was entered by an associate circuit judge before the information was filed, and (2) no hearing was held before the taking. The trial court overruled the objection and received Exhibit 27 in evidence.

We need not decide whether Exhibit 27 was admissible by reason of the order of February 22, 1993, by the associate circuit judge. We hold that when the trial court granted the prosecutor's motion for continuance on January 5, 1994, knowing the reason for the continuance was to obtain a sample of Defendant's blood for testing, the trial court implicitly granted the motion for a blood sample that had been on file since February 10, 1993. Had the trial court, on January 5, 1994, concluded Defendant's blood should not be taken, there would have been no reason to grant the continuance. When Defendant objected to Exhibit 27 at trial on the ground that the order was entered by the associate circuit judge before the preliminary hearing, the trial court responded, "I remember or I seem to recall that I ordered blood samples also...." Although the matter was handled with abnormal informality, it is evident the

trial court considered and approved the taking before it occurred.

 We likewise find no reason for reversal in Defendant's argument that Exhibit 27 was obtained without a hearing. Rule 25.06(C) requires an evidentiary hearing *if requested by any party*. Defendant does not cite anyplace in the record showing she requested the trial court to hear evidence on the necessity of the blood sample. As noted earlier, the trial court, in considering the prosecutor's request for continuance on January 5, 1994, allowed Defendant's lawyer to be heard. At that time, no blood had been taken from Defendant. Defendant's lawyer knew the reason for the continuance was to obtain the blood. Had Defendant's lawyer wanted the trial court to receive evidence on the issue, Defendant's lawyer could have made the request on January 5, 1994.

Although this case is not a model of compliance with Rule 25.06, we hold the trial court did not err in receiving Exhibit 27 in evidence over the objection at trial.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.